UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

| | |
|---|---|
| Nora Patricia Ruiz, Individually and as Representative of the Estate of Hector Ruiz, Deceased, and Hector A. Ruiz, biological son<br><br>*Plaintiffs,*<br><br>-vs-<br><br>TRW Vehicle Safety Systems, Inc.,<br><br>*Defendant.* | 3:17-CV-03006-RAL<br><br>**PLAINTIFFS' SECOND AMENDED COMPLAINT** |

**To the Honorable United States Judge of Said Court:**

COME NOW, Nora Patricia Ruiz, Individually and as Representative of the Estate of Hector Ruiz, Deceased, and Hector A. Ruiz, a biological son (hereinafter referred to as "Plaintiffs"), and file this Second Amended Complaint against TRW Vehicle Safety Systems, Inc. (hereinafter referred to as "Defendant" or "TRW").

In support hereof, Plaintiffs would state and show unto the Honorable Court the following:

### I. Parties

1.  Plaintiff, Nora Ruiz, is the surviving wife of Hector Ruiz, deceased. She resides in and is a citizen of Jacksonville, Texas.

2. Plaintiff, Hector A. Ruiz is a surviving son of Hector Ruiz, deceased. He resides in and is a citizen of Jacksonville, Texas.

3. Defendant, TRW Vehicle Safety Systems, Inc. is a Delaware corporation with its principal place of business in Washington, Michigan.

4. TRW's parent company, ZF Friedrichshafen AG, also known as ZF Group, is headquartered in Friedrichshafen, Germany, and has over 138,000 employees worldwide. TRW was purchased by ZF Group in 2014-2015 for approximately $13.5 billion.

5. TRW has been supplying numerous automotive parts and safety systems (including seatbelts) to a global market for almost 6 decades. In 2013 alone, TRW had sales of $17.4 billion.

6. TRW has approximately 200 facilities with 66,100 employees in 26 vehicle-producing countries designing and/or manufacturing component parts for millions of vehicles which are bound for every state in the United States, including South Dakota.

7. TRW designs, manufactures, tests, assembles, sells, distributes, and/or places TRW component parts into the stream of commerce, such as the seatbelt system in the subject vehicle involved in the incident made the basis of this suit.

8. TRW knows that its component parts—including the seatbelt system at issue in this case—will ultimately wind up in all fifty (50) states, including the State of South Dakota. Indeed, TRW component parts and seatbelt systems—including

the specific seatbelt system at issue in this case—are found in tens of thousands of vehicles in South Dakota.

9. TRW, in no way, shape, or form, ever restricted (or made a request to Ford or its authorized dealers to restrict) the subject seatbelt system—which caused the fatal injuries—from being distributed, sold, or used in South Dakota.

10. TRW has contracts with companies such as Ford who TRW knows will sell its products in South Dakota, including the subject seatbelt system at issue in this case.

11. TRW holds a significant quantity of intellectual property, including a large number of patents, trademarks, copyrights, and trade secrets which it demands must be honored in South Dakota.

12. Employees, officers, and/or directors of TRW have visited, lived, conducted business, and/or worked in South Dakota numerous times.

13. TRW manufactures and/or designs its products to comply with United States standards, including the Federal Motor Vehicle Safety Standards (FMVSS).

14. TRW has corresponded and/or worked with the National Highway Traffic Safety Administration (NHTSA) on safety issues, including safety issues for products in vehicles owned and used by South Dakota residents.

## II. Jurisdiction

15. This Court has jurisdiction over the lawsuit under the provisions of 28 U.S.C. Section 1332.

16. The parties to this lawsuit are citizens of difference states, and the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.

17. TRW is subject to specific jurisdiction in this Court because the claims against TRW in this case are linked to TRW's conduct; TRW placed the subject seatbelt system into the stream of commerce where it ultimately ended up in South Dakota, and the key elements of the episode-in-suit occurred in South Dakota.

18. Furthermore, TRW has purposefully availed itself in South Dakota, because TRW's contacts with South Dakota principally relate to the sale of component parts in millions of vehicles and all of the conduct associated with such sales and this civil action is related to and connected with the component part, and because due process and fair play and substantial justice are honored by this civil action going forward in this South Dakota Court.

19. There is little or no burden on TRW litigating this case in this South Dakota Court.

20. Additionally, South Dakota has an interest in overseeing this litigation which involves a defective product which exists and is used daily in thousands upon thousands of vehicles in South Dakota.

21. TRW cannot deny personal jurisdiction because TRW placed the subject product into the stream of commerce under circumstances such that TRW should reasonably anticipate being haled into court in South Dakota.

22. In short, TRW is in the business of the design and manufacture of component parts, including the component part which caused the fatal injuries complained of herein. TRW has purposefully availed itself of the privilege and benefits of conducting activities within South Dakota.

23. Accordingly, TRW is therefore subject to be sued in South Dakota courts, and exercise of personal jurisdiction is, among other things, consistent with due process because Defendant has purposefully availed itself of the privilege of doing business in the forum.

### III. Facts

24. On or about January 21, 2015, Hector Ruiz was driving a 2006 Ford F250 (VIN#1FTSX21Y96ED93318) traveling southbound on Highway 47 near Reference Marker 27 in Gregory County, South Dakota and was properly wearing his 3-point restraint system.

25. The 3-point restraint system was designed by TRW Vehicle Safety Systems, Inc.

26. The 3-point restraint system was manufactured by TRW Vehicle Safety Systems, Inc.

27. The 3-point restraint system was also assembled and tested by TRW Vehicle Safety Systems, Inc.

28. While Hector Ruiz was traveling southbound on Highway 47, the vehicle hit a patch of black ice, lost control, skidded, traveled through a ditch, and ultimately the vehicle rolled.

29. At the time of the accident, Hector Ruiz was properly seated and wearing his 3-point seat belt and had his RNS3G buckle latched.

30. However, despite being properly seated and properly wearing his 3-point seatbelt, Hector Ruiz suffered fatal injuries when the restraint system failed to protect him because the RNS3G buckle unlatched during the accident and allowed him to be ejected because the buckle was defective and unreasonably dangerous and it violated several crashworthiness principles.

31. Crashworthiness is the science of preventing or minimizing serious injuries or death following an accident through the use of the vehicle's safety systems including the seatbelt buckle.

32. There are five (5) recognized crashworthiness principles in the vehicle/component part industry/throughout the world. They are as follows:

    1. Maintain survival space;

    2. Provide proper restraint throughout the entire accident;

    3. Prevent ejection;

    4. Distribute and channel energy; and

    5. Prevent post-crash fires.

33. When the National Highway Traffic Safety Administration (NHTSA) created the Federal Motor Vehicle Safety Standard (FMVSS) in the late 1960's, the preamble to the safety standards included a crashworthiness definition similar to that used above, "that the public is protected against unreasonable risk of crashes occurring as a result of the design, construction, or performance of motor vehicles and is

also protected against unreasonable risk of death or injury in the event crashes do occur."

34. The National Transportation Safety Board (NTSB) has also stated that, "Vehicle crashworthiness refers to the capacity of a vehicle to protect its occupants from crash forces. This protection—which is achieved, in part, by vehicle structure—includes maintaining a survival space around the occupant, retaining the occupant within that space, and reducing the forces applied to the occupant."

35. Crashworthiness safety systems in a vehicle must work together like links in a safety chain. If one link fails, the whole chain fails.

36. Vehicle manufacturers and component part suppliers who supply safety systems in vehicles have known for decades and have admitted under oath that there is a distinction between the cause of an accident versus the cause of an injury.

37. Indeed, vehicle manufacturers and component part suppliers have known for decades that crashworthiness is the science of preventing or minimizing injuries or death **following** an accident through the use of a vehicle's various safety systems.

38. Lee Iacocca, former President of Ford Motor Company stated, while President and CEO of Chrysler, that "Every American has the right to a safe vehicle."

39. General Motors has stated in the past that, "The rich don't deserve to be safer ... Isn't it time we realized safety is not just for the pampered and the privileged? Safety is for all."

40. Volvo has stated that it has a goal that no one is killed or injured in a Volvo vehicle by the year 2020. Volvo has also stated that, "Technologies for meeting the goal of zero injuries and fatalities are basically known today – it is a matter of how to apply, finance, distribute and activate."

41. Because every American has the right to a safe vehicle, because safety is for all, and because technologies for meeting the goal of zero injuries and fatalities are basically known today, it is incumbent upon manufacturers to investigate and find out what other automakers or component part suppliers are doing with regards to safety and to apply those same methods or technology to their own vehicles or component parts. Furthermore, an automaker or component part supplier cannot choose to use safer technology in Europe, Australia, Japan, or some other country and refuse or fail to offer that same safety technology to consumers in America.

42. It is further incumbent upon manufacturers to protect consumers by using knowledge that a manufacturer has acquired over decades and decades of vehicle and component part design, testing, and reverse engineering of other manufacturers' vehicles or safety systems.

43. In fact, insofar as society permits manufacturers to operate in such a way that they are permitted to sell highly complex, potentially dangerous, and also potentially highly profitable products on the market, manufacturers have a duty to do their very best to ensure that the vehicle and its safety systems will not be harmful to buyers, their households, or third parties.

44. This is cemented by the fact that every state of the United States has case law which holds that every person has a duty to exercise reasonable care to avoid a foreseeable risk of injury to others.

45. Most (if not all) engineering associations in the United States (and around the world) have a code of ethics. The number 1 fundamental canon of ethics for almost all engineers is to "hold paramount the safety, health, and welfare of the public." Accordingly, since paramount means "superior to all others", all vehicle and component part engineers have to hold the safety, health, and welfare of the public as their highest considerations when they design vehicles.

46. Although it is true that there are minimum performance standards which an automaker is supposed to meet before selling a vehicle in the United States (the FMVSS), these minimum performance standards do not adequately protect the public.

47. Indeed, Joan Claybrook, former administrator of the NHTSA, wrote a letter to major auto makers where she said, "Our federal safety standards are and were intended by Congress to be minimum standards. The tragedy is that many manufacturers have treated the standards more like ceilings on safety performance rather than floors from which to improve safety."

48. Additionally, in September of 2014, a Congressional report was issued in response to the General Motors ignition switch recall. The report questioned whether NHTSA had the technical expertise, culture and analytic tools needed to address safety issues. The report stated, "NHTSA also lacked the focus and rigor expected of

a federal safety regulator". It was also stated that NHTSA staff has a "lack of knowledge and awareness regarding the evolution of vehicle safety systems they regulate."

49. Thus, it is clear that a prudent manufacturer's research and analysis should not stop with standards compliance. When it knows—or, through reasonable diligence, should know—that a product design presents a latent hazard or foreseeable risk of injury, it should go above and beyond the minimum requirements set forth in mandatory standards, rules, and/or regulations.

## IV. Cause(s) of Action as to Defendant

50. It was entirely foreseeable to and well-known by Defendant that accidents and incidents involving its restraint systems, such as occurred herein, would on occasion take place during the normal and ordinary use of said restraint system.

51. The injuries complained of occurred because the restraint system in question was not reasonably crashworthy, and was not reasonably fit for unintended, but clearly foreseeable, accidents. The restraint system in question was unreasonably dangerous in the event it should be involved in an incident such as occurred herein.

52. Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said restraint system in question.

53. As detailed herein, the restraint system contains and/or Defendant has committed either design, manufacturing, marketing, assembling, and/or testing defects.

54. Defendant either knew or should have known of at least one safer alternative design which would have prevented the ejection and fatal injuries to Hector Ruiz because its RNS3G buckle was prone to unlatch.

55. In addition to the foregoing, Defendant, either alone or in conjunction with some other individual(s) and/or entity(ies), designed, manufactured, marketed, assembled, and/or tested said restraint system in question to be unreasonably dangerous and defective within the meaning of Section 402(A) Restatement (Second) Torts, in that the restraint system was unreasonably dangerous as designed, manufactured, assembled, marketed, and/or tested because Defendant knew and/or should have known of the following, non-exhaustive list of defects:

    a. The vehicle's RNS3G buckle failed to provide proper restraint throughout the entire accident;
    b. The vehicle's RNS3G buckle failed to provide adequate protection throughout the entire accident;
    c. The vehicle's RNS3G seatbelt buckle unlatched during the accident in violation of FMVSS 209, SAE J128 and SAE J4C;
    d. The vehicle's RNS3G buckle violated principles of crashworthiness by not providing proper restraint;
    e. The vehicle's RNS3G buckle violated the purpose of a seatbelt;
    f. The vehicle's RNS3G buckle via its restraint system failed to serve the purpose of a seatbelt restraint;
    g. The restraint system was defective and unreasonably dangerous because the RNS3G buckle was prone to unlatch during accidents;
    h. The restraint system failure was the producing cause of the ejection, the fatal injuries and the damages;

    i. The vehicle's RNS3G buckle via its restraint system violated principles of crashworthiness;
    j. Defendant failed to conduct adequate testing;
    k. The Defendant failed to conduct thorough engineering analysis;
    l. Testing by Defendant has revealed that the subject RNS3G buckle can unlatch;
    m. The subject RNS3G buckle is prone to unlatch during accidents;
    n. The subject RNS3G buckle fails to stay buckled throughout the entire accident;
    o. The subject RNS3G buckle violated the intent and purpose of a seatbelt buckle;
    p. The subject RNS3G buckle violates principles of crashworthiness;
    q. The RNS3G buckle was prone to false latch because the ejector springs are prone to fracture;
    r. The actual RNS3G buckle in the subject vehicle had fractured ejector springs;
    s. The actual RNS3G buckle in the subject vehicle had experienced false latching issues in the past;
    t. The subject RNS3G buckle violates Ford's corporate objectives; and/or
    u. The subject RNS3G buckle violates TRW's corporate objectives.

56. Defendant was further negligent in the design, manufacture, assembly, marketing, and/or testing of the restraint system in question.

57. In designing a buckle restraint system, efforts should be made by manufacturers to identify potential risks, hazards, and/or dangers that can lead to serious injury or death.

58. Once potential risks, hazards, and/or dangers are identified, then the potential risks, hazards, or dangers should be eliminated if possible.

59. If the potential risks, hazards, and/or dangers can't be eliminated, then they should be guarded against.

60. If the potential risks, hazards, and/or dangers can't be eliminated or guarded against, they should at least be warned about.

61. A company that does not conduct a proper engineering analysis that would help it to identify potential risks, hazards, and/or dangers that could seriously injure someone is negligent.

62. Based upon information and/or belief, Defendant either used or knew about advanced safety features used in Europe, Australia, Japan and some other country and chose not to offer those safety features to American consumers.

63. Defendant's occupant protection philosophy and design philosophy are utilized in various models, including ones sold overseas in other markets.

64. When Defendant designed the subject restraint system, it did not reinvent the wheel. Defendant used an enormous amount of human capital which had been acquired from numerous different engineers which had worked on many prior restraint systems. This knowledge would have been utilized in different aspects of the various designs of the subject restraint system.

65. Defendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the restraint system in question. Defendant is also in possession of what, if any, engineering analysis it performed.

66. However, it is expected that after all of these materials are produced in discovery and/or after Defendant's employees and corporate representatives have been deposed, additional allegations may come to light.

67. Lastly, the materials from other models, years, and countries will provide evidence regarding what Defendant knew, when it knew it, and about what was utilized or not utilized as well as the reasons why.

68. The foregoing acts and/or omissions of Defendant were the producing, direct, and/or proximate cause of the Hector Ruiz' ejection, fatal injuries, and Plaintiffs' damages.

## V. Damages to Plaintiff

69. Plaintiffs seek recovery for all available damages under any applicable statute and/or common laws of the state of South Dakota.

70. As a result of the acts and/or omissions of Defendant, Plaintiffs have suffered in the past and will in the future: loss of care, maintenance, support, services, advise, counsel, reasonable contributions of pecuniary value, loss of companionship and society, loss of consortium, emotional distress, and mental anguish as a result of the death of their spouse and father Hector Ruiz.

71. The above and foregoing acts and/or omissions of Defendant, resulting in the fatal injuries to Hector Ruiz, have caused actual damages to Plaintiffs in the excess of the minimum jurisdictional limits of this Court.

## VI. Demand for Jury Trial

72. Plaintiffs respectfully assert their rights under the Seventh Amendment to the United States Constitution and demand, in accordance with Federal Rule of Civil Procedure 38, a trial by jury on all issues.

## VII. Conclusion and Prayer

73. For the reasons presented herein, Plaintiffs pray that Defendant be cited to appear and answer, and that upon a final trial of this cause, Plaintiffs recover judgment against Defendant for:

   a. actual damages;
   b. economic and non-economic damages;
   c. prejudgment and post-judgment interest at the maximum rate allowed by law;
   d. costs of suit; and
   e. all other relief, general and special, to which Plaintiffs are entitled to at law and/or in equity, and/or which the Court deems proper.

Dated 9th day of June, 2017.

Respectfully submitted,

MAY, ADAM, GERDES & THOMPSON LLP

BY: *Katie Hruska*
KATIE J. HRUSKA
503 South Pierre Street
P.O. Box 160
Pierre, SD 57501
(605) 224-8803
kjh@mayadam.net

*And*

THE TRACY FIRM

BY: _____
E. Todd Tracy
*Pro Hac Vice*
EToddTracy@vehiclesafetyfirm.com
Stewart D. Matthews
*Pro Hac Vice*
SMatthews@vehiclesafetyfirm.com
Andrew G. Counts
*Pro Hac Vice*
ACounts@vehiclesafetyfirm.com
4701 Bengal Street
Dallas, Texas 75235
(214) 324-9000 – Phone
(972) 387-2205 – Fax

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of June, 2017, I caused to be electronically filed the foregoing document with the clerk of the court for the U.S. District Court, District of South Dakota, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this Notice as service of this document by electronic means.

_____
Katie J. Hruska