UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

| | |
|---|---|
| NORA PATRICIA RUIZ, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF HECTOR RUIZ, DECEASED; AND HECTOR A. RUIZ, BIOLOGICAL SON, <br><br>Plaintiffs, <br><br>vs. <br><br>TRW VEHICLE SAFETY SYSTEMS, INC., <br><br>Defendant. | 3:17-CV-03006-RAL <br><br><br>OPINION AND ORDER GRANTING MOTION TO DISMISS AND DENYING JURISDICTIONAL DISCOVERY |

Plaintiffs Nora Patricia Ruiz, individually and as representative of the Estate of Hector Ruiz, and Hector A. Ruiz as the biological son (Plaintiffs) sued Defendant TRW Vehicle Safety Systems, Inc. (TRW) alleging products liability, negligence, and wrongful death of Hector Ruiz. Doc. 26. TRW moved to dismiss the action for lack of personal jurisdiction, Doc. 13, and Plaintiffs opposed that motion, Doc. 27. For the reasons stated below, this Court will grant TRW's motion to dismiss or, if Plaintiffs request, transfer the case to a district with jurisdiction.

I.    **Facts**

Plaintiffs are the surviving wife and son of Hector Ruiz. Doc. 27 at ¶¶ 1–2. They are residents of Jacksonville, Texas. Doc. 27 at ¶¶ 1–2. Defendant TRW is a Delaware corporation with its principal place of business in Michigan. Doc. 14-1 at ¶ 5. TRW designs and manufactures original equipment automotive seat belt assemblies for its customers, most of which are motor vehicle manufacturers. Doc. 14-1 at ¶ 6.

1

On January 21, 2015, Ruiz was driving a 2006 Ford F-250 southbound on Highway 47 in Gregory County, South Dakota, when his vehicle hit a patch of black ice and rolled. Doc. 26 at ¶¶ 24, 28. During the rollover, Ruiz was ejected from the vehicle, sustaining fatal injuries. Doc. 26 at ¶ 30. The Plaintiffs allege that at the time of the rollover, Ruiz was wearing his seat belt, and that the seat belt buckle became unlatched because it was defective. Doc. 26 at ¶¶ 29–30.

The seat belt assembly in Ruiz's truck was manufactured by TRW. Doc. 14-1 at ¶ 9. TRW manufactured the seat belt assembly in Mexico and shipped the subject belt and retractor and buckle assemblies to a facility of Johnson Controls, Inc., a seat supplier to Ford Motor Company (Ford), in Shelbyville, Kentucky. Doc. 14-1 at ¶ 9. Ruiz's Ford F-250 was assembled in Kentucky at Ford's Kentucky truck plant in 2006, and then sold by Ford to All Star Ford-Palestine, a Ford dealership in Texas. Doc. 14-2 at ¶ 4. It appears from the title history of the pickup that it was sold and resold to several different parties in Texas. Doc. 14-3 at 10, 12. On December 12, 2013, Hector and Nora Ruiz bought the pickup. Doc. 14-3 at 6.

Once TRW delivers its seat belt assemblies to a seat supplier or motor vehicle manufacturer, it has no further control over the assembly or where it goes. Doc. 14-1 at ¶ 11. TRW did not sell the seat belt assembly in South Dakota, does not advertise in South Dakota, does not conduct any business in South Dakota, is not licensed to conduct business in South Dakota, does not pay taxes in South Dakota, does not own property in South Dakota, and does not have any employees, management personnel, officers, or directors that reside in, or are located in, South Dakota. Doc. 14-1 at ¶¶ 12a–12i.

The Plaintiffs made a number of allegations regarding TRW's "significant business" in South Dakota: 1) TRW supplies automotive parts and safety systems to a global market and has been doing so for almost six decades; 2) TRW designs and manufactures component parts for

millions of vehicles which are bound for every state in the United States, including South Dakota; 3) TRW places component parts into the stream of commerce; 4) TRW component parts and seatbelt systems are found in tens of thousands of vehicles in South Dakota; 5) TRW does not restrict its seat belt systems from being distributed, sold, or used in South Dakota; 6) TRW has contracts with companies like Ford and knows those companies sell their products in South Dakota; 7) TRW holds a significant quantity of intellectual property, such as patents, trademarks, copyrights, and trade secrets, which it demands be honored in South Dakota; 8) employees, officers, and directors of TRW may have visited, lived, conducted business, and worked in South Dakota[1]; 9) TRW manufactures and designs its products to comply with United States standards, including the Federal Motor Vehicle Safety Standards (FMVSS); and 10) TRW works with the National Highway Traffic Safety Administration (NHTSA) on safety issues for products in vehicles owned and used by South Dakota residents. Doc. 26 at 2–3; Doc. 27 at ¶ 33.

## II. Analysis

### A. Personal Jurisdiction

The showing a plaintiff must make when the defendant contests personal jurisdiction under Rule 12(b)(2) depends on the stage of the case and the method the court employs to resolve the jurisdictional dispute. See K-V Pharm. Co. v. J. Uriach & CIA, S.A., 648 F.3d 588, 591–92 (8th Cir. 2011); Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir. 1991). At trial or after an evidentiary hearing, the plaintiff must prove personal jurisdiction by a preponderance of the evidence. Creative Calling Sols., Inc. v. LF Beauty Ltd., 799 F.3d 975, 979 (8th Cir. 2015); Epps v. Stewart Info. Servs. Corp., 327 F.3d 642, 647 (8th Cir. 2003).

---

[1]TRW has submitted affidavits which contradict the Plaintiffs' allegations regarding employees in South Dakota. TRW states they have no "employees, management personnel, officers, or directors that reside in, or are located in, South Dakota." Doc. 14-1 at ¶ 12i.

But when, as here, the court limits its review of a Rule 12(b)(2) motion solely to affidavits and other written evidence, the plaintiff "need only make a prima facie showing of [personal] jurisdiction." Dakota Indus., 946 F.2d at 1387. "Although the evidentiary showing required at the prima facie stage is minimal, the showing must be tested, not by the pleadings alone, but by the affidavits and exhibits supporting or opposing the motion." K-V Pharm. Co., 648 F.3d at 592 (internal marks and citations omitted). This Court construes the materials filed in the light most favorable to the Ruiz Plaintiffs and resolves all factual disputes on jurisdictional issues against TRW at this time. Therefore, discovery on jurisdictional issues would be of no benefit to these Plaintiffs.

A federal court sitting in diversity may exercise jurisdiction over nonresident defendants only if both the forum state's long-arm statute and the Fourteenth Amendment's Due Process Clause are satisfied. Morris v. Barkbuster, Inc., 923 F.2d 1277, 1280 (8th Cir. 1991). Because South Dakota's long-arm statute confers jurisdiction to the full extent permissible under the Due Process Clause, the question here is whether asserting personal jurisdiction over TRW comports with due process. Bell Paper Box, Inc. v. U.S. Kids, Inc., 22 F.3d 816, 818 (8th Cir. 1994) (applying South Dakota law).

Personal jurisdiction under the Due Process Clause may be either general or specific. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 924–25 (2011). Courts with general jurisdiction over a defendant may hear "any and all claims" against the defendant, even if those claims are unrelated to the defendant's contacts with the forum state. Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014) (quoting Goodyear, 564 U.S. at 919). For general jurisdiction to exist, the defendant's contacts with the forum state must be "so 'continuous and systematic'" that the defendant is "essentially at home" there. Goodyear, 564 U.S. at 919

4

(quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)). TRW's contacts with South Dakota fall far short of the sort of continuous and systematic presence necessary for general jurisdiction. Specific jurisdiction, by contrast, may be based on a defendant's solitary or irregular contact with the forum state. Daimler, 134 S. Ct. at 754. Unlike general jurisdiction, however, specific jurisdiction is limited to suits arising out of or relating to the defendant's contact with the forum state. Goodyear, 564 U.S. at 919.

Courts may exercise specific jurisdiction over an out-of-state defendant if the defendant has "certain minimum contacts" with the state such that having to defend a lawsuit there "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co., 326 U.S. at 316 (quotation omitted). These minimum contacts must be based on "some act by which the defendant purposefully avails" himself of the forum state "such that he should reasonably anticipate being haled into court there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474–75 (1985) (quotations omitted). It is the defendant, rather than the plaintiff or a third party, who must establish the minimum contacts in the forum state. Walden v. Fiore, 134 S. Ct. 1115, 1122 (2014). Moreover, the defendant's contacts must be "with the forum State itself, not . . . with persons who reside there." Id.; see also id. at 1123 ("Due process requires that a defendant be haled into court in a forum State based on his own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts he makes by interacting with other persons affiliated with the State." (quoting Burger King, 471 U.S. at 475)).

Under Eighth Circuit precedent, five factors guide evaluating whether the constitutional requirements for personal jurisdiction have been met: "(1) the nature and quality of the contacts with the forum state; (2) the quantity of contacts with the forum; (3) the relation of the cause of action to these contacts; (4) the interest of the forum state in providing a forum for its residents;

and (5) the convenience of the parties." Digi-Tel Holdings, Inc. v. Proteq Telecomms. (PTE), Ltd., 89 F.3d 519, 522–23 (8th Cir. 1996) (footnote omitted). The first three factors are the most important while the last two are secondary. Id. at 523. In cases where a defendant lacks traditional contacts with a forum state, the Supreme Court "has placed less emphasis on the territorial jurisdiction of each state and, instead, focused on the actions of the defendant and the corresponding impact on the forum State." Estate of Moore v. Carroll, 159 F. Supp. 3d 1002, 1009 (D.S.D. 2016). Two theories of specific jurisdiction have emerged, the "effects test" and the "stream of commerce" theory. Id. (internal citations omitted). The Plaintiffs' arguments essentially assert specific jurisdiction based on the stream of commerce theory in this products liability case.

Specific jurisdiction analysis in product liability cases, such as this one, has divided the Supreme Court of the United States and resulted in somewhat conflicting guidance to lower courts. A majority of the Supreme Court in World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286 (1980), recognized that a defendant's placement of goods into the stream of commerce "with the expectation that they will be purchased by consumers in the forum State" may indicate purposeful availment. Id. at 298. The Supreme Court after World-Wide Volkswagen has produced two fractured opinions on the application of the stream of commerce doctrine to justify personal jurisdiction in products liability cases. In Asahi Metal Indus. Co., Ltd. v. Superior Court, 480 U.S. 102 (1987), Justice O'Connor wrote for a four-justice plurality. Justice O'Connor noted that in the aftermath of World-Wide Volkswagen lower courts had diverged as to whether the Due Process Clause allowed a court to exercise personal jurisdiction over a defendant that had merely placed its product into the stream of commerce, or whether additional action on the part of the defendant was required. Id. at 110. (O'Connor, J). Agreeing with those

6

courts that required more[2], Justice O'Connor reasoned "[t]he placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State." Id. at 112. Justice Brennan in Asahi wrote a concurrence in which three other justices joined, disagreeing that additional conduct on the part of the defendant was necessary and stating that if a manufacturer "is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." Id. at 117 (Brennan, J). All the justices in Asahi agreed that "traditional notions of fair play and substantial justice" under International Shoe justified dismissal of the portion of the case that remained after various parties had settled—an indemnity claim by a Taiwanese tire tube manufacturer against a Japanese manufacturer of the tube's valve assembly relating to a California motorcycle accident. Id. at 106, 113–15. Because of the lack of a majority decision on the stream of commerce theory of personal jurisdiction, a panel of the Eighth Circuit later viewed Asahi as "stand[ing] for no more than that it is unreasonable to adjudicate third-party litigation between two foreign companies in this country absent consent by the nonresident defendant."[3] Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 614 (8th Cir. 1994).

Twenty years after Asahi, the Supreme Court in J. McIntyre Machinery Ltd., v. Nicastro, 564 U.S. 873 (2011), failed to produce a majority opinion on application of the stream of commerce doctrine to resolve a personal jurisdiction question in a products liability case. Writing for a four-justice plurality, Justice Kennedy criticized Justice Brennan's Asahi

---

[2] Justice O'Connor cited to the Eighth Circuit's opinion in Humble v. Toyota Motor Co., 727 F.2d 709 (8th Cir. 1984), as her example of a court that had "understood the Due Process Clause to require something more than that the defendant was aware of its product's entry into the forum State through the stream of commerce in order for the State to exert jurisdiction over the defendant." 480 U.S. at 111. (O'Connor, J).

[3] Asahi in fairness stands for more as all justices joined in Part II.B. of the decision which contains some elaboration on applying International Shoe and World-Wide Volkswagen and the concept of "traditional notions of fair play and substantial justice."

concurrence for relying too heavily on foreseeability and remarked that "[t]he principal inquiry...is whether the defendant's activities manifest an intention to submit to the power of a sovereign." Nicastro, 564 U.S. at 882 (Kennedy, J). However, Justice Breyer writing a concurrence joined by Justice Alito voiced his disagreement with both Justice Kennedy's approach and with the respondent's argument for personal jurisdiction based on "a single, isolated sale," and concurred only in the judgment. Id. at 887–93 (Breyer, J). Justice Breyer believed the case was an inappropriate one in which to "announce a rule of broad applicability" and declared "the outcome of this case is determined by our precedents." Id. at 887.

The United States Court of Appeals for the Eighth Circuit has decided a series of cases on personal jurisdiction over manufacturers who place products in the stream of commerce. In the Eighth Circuit, "[p]ersonal jurisdiction may be found where a seller uses a distribution network to deliver its products into the stream of commerce with the expectation that the products will be purchased by consumers of the forum state." Stanton v. St. Jude Med., Inc., 340 F.3d 690, 694 (8th Cir. 2003) (citing World-Wide Volkswagen, 444 U.S. at 297–98). But the "placement of a product into the stream of commerce, without more, does not constitute an act of the defendant purposefully directed toward the forum State." Falkirk Mining Co. v. Japan Steel Works, Ltd., 906 F.2d 369, 376 (8th Cir. 1990). In other words, "a manufacturer whose product ends up in the forum State on an 'attenuated, random, or fortuitous' basis" does not have the necessary minimum contacts with the state. Vandelune v. 4B Elevator Components Unlimited, 148 F.3d 943, 948 (8th Cir. 1998). Yet, the Eighth Circuit has "recognize[d] a variant of stream-of-commerce jurisdiction over a foreign manufacturer that pours its products into a regional distributor with the expectation that the distributor will penetrate a discrete, multi-State trade area." Viasystems, Inc. v. EBM-Papst St. Georgen GmBH & Co., KG, 646 F.3d 589, 597 (8th

Cir. 2011) (internal citations and quotations omitted). The Eighth Circuit developed this variant in Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d at 612–15, and has applied Barone in subsequent cases. Vandelune, 148 F.3d at 948. Under a stream of commerce analysis, the Eighth Circuit's five-factor test is not supplanted; rather stream of commerce provides an overlay through which the factors may be viewed and the analysis augmented. Carroll, 159 F. Supp. 3d at 1012; see, e.g., Barone, 25 F.3d at 612–15 (no explicit application of the five-factor test but, instead, the Eighth Circuit introduces the "stream of commerce" variant); Vandelune, 148 F.3d at 947–48 (no explicit application of the five-factor test, but rather a discussion about whether the stream of commerce variant applies); Clune v. Alimak AB, 233 F.3d 538, 541–45 (8th Cir. 2000) (same).

In support of its motion to dismiss, TRW states that because "[t]he subject vehicle ended up in South Dakota by a long string of unilateral actions of third parties," there was no purposeful availment that would give rise to personal jurisdiction. Doc. 14 at 7. In response, the Plaintiffs have argued that the Eighth Circuit's stream of commerce variant provides for personal jurisdiction when "the manufacturer utilizes a method to direct its product into the State, such as a distributor, knowing the product is likely to be utilized by consumers in the State." Doc. 27 at ¶ 15. The Plaintiffs' contention is that Ford acts as TRW's distributor, sending "thousands (millions) of component parts that it manufactures" into every state, including South Dakota. Doc. 27 at ¶¶ 16–17. These actions, according to the Plaintiffs, "when viewed through the variant of the stream of commerce theory, absolutely permits this Court jurisdiction in this matter." Doc. 27 at ¶ 17. In its reply brief[4], TRW emphasizes that "Ford, a finished vehicle

---

[4] TRW cited to Tarver v. Ford Motor Co., No. CIV-16-548-D, 2016 U.S. Dist. LEXIS 167363 (W.D. Okla. Dec. 5, 2016), in its reply brief, Doc. 28 at 6, to support its motion to dismiss. Tarver was another case involving a plaintiff suing TRW for an allegedly defective seat belt that

9

manufacturer, is *not* a distributor of TRW seat belt assemblies." Doc. 28 at 4. In a footnote, TRW argues that even if Ford were a distributor of TRW's products, personal jurisdiction would still "not pass Due Process muster." Doc. 28 at 4 n.3.[5] Ultimately, TRW argues, it cannot be subject to personal jurisdiction in South Dakota due to the "actions of Ford, Plaintiffs, or any other third party." Doc. 28 at 6. However, neither party's arguments properly apply the Eighth Circuit's case law in this area. In order to understand the Barone variant and how to correctly apply it, this Court looks to Eighth Circuit cases where it has been applied and rejected.

In Barone, Bernard Barone was injured in Nebraska when a fireworks display he was setting off allegedly malfunctioned. 25 F.3d at 610. Barone filed suit in federal court in Nebraska against the distributor, Rich Bros. Interstate Display Fireworks Co. (Rich Bros.) of Sioux Falls, South Dakota, which had sold Highland the fireworks, as well as Hosoya Fireworks

---

resulted in a fatal injury during a vehicle rollover. Id. at *2. The district court there also concluded that Oklahoma could not exercise personal jurisdiction over TRW, but its reasoning was based on the test articulated by Justice O'Connor in Asahi. Id. at *18–19. Because this test is distinct from the Eighth Circuit's stream of commerce analysis and is based on a plurality opinion in Asahi, Tarver is of little value in this discussion.

[5] One of the cases TRW cites to support its contention that using a distributor cannot render them subject to jurisdiction is the Supreme Court's most recent case regarding specific personal jurisdiction, Bristol-Myers Squibb Co. v. Superior Court of Cal., 137 S. Ct. 1773 (2017). That case does not support this proposition. In Bristol-Myers, the dispositive question was whether Bristol-Myers Squibb's (BMS) contacts with California would allow California state courts to exercise personal jurisdiction over BMS regarding the claims of the *out of state* plaintiffs. 137 S. Ct. at 1777. The California Supreme Court upheld personal jurisdiction over these claims (alleged injury from using Plavix, a pharmaceutical developed by BMS) based on BMS's contacts with California, which included several research facilities, a few hundred employees, a state government advocacy office, and the sale of some 187 million pills of Plavix. Id. at 1778. The California Supreme Court held that BMS's contacts with the state lessened the requisite direct connection between the defendant's contacts and the claims of the out-of-state plaintiffs. Id. at 1779. The Supreme Court reversed, rejecting the California Supreme Court's sliding-scale approach as "a loose and spurious form of general jurisdiction." Id. at 1781. None of the out-of-state plaintiffs had suffered harm in California, and "all the conduct giving rise to the nonresidents' claims occurred elsewhere." Id. However, California did have jurisdiction over the claims of the California plaintiffs, a fact which BMS acknowledged. Id. at 1785 (Sotomayor, J., dissenting).

Co. (Hosoya), a manufacturer based in Tokyo, Japan. Id. at 610–611. Hosoya had no office, agent for service of process, or distributor in Nebraska; did not advertise in Nebraska; and did not sell its products directly into Nebraska. Id. at 611. The district court granted Hosoya's motion to dismiss for lack of personal jurisdiction, but the Eighth Circuit reversed. Id. Central to the Eighth Circuit's decision was the fact that Hosoya sold its fireworks to regional distributors in six states, one of which was Rich Bros. in South Dakota. Rich Bros. purchased $600,000 worth of fireworks from Hosoya, and resold roughly sixteen percent of those fireworks into Nebraska. Id. Rich Bros. sold fireworks through a catalog by mail and had one of its six regional salesmen located in Nebraska. Id. The Eighth Circuit determined that Hosoya had benefitted from the distribution efforts of Rich Bros., and rejected the notion that Hosoya was unaware that its fireworks sold to Rich Bros. in South Dakota were resold into Nebraska. Id. at 613. After all, Sioux Falls was "conveniently located within [a] short distance of three other states" and Rich Bros. even included "interstate" in its name. Id. Hosoya's choice of distributors was "evidence of Hosoya's efforts to place its products in the stream of commerce throughout the Midwest and other parts of the country as well." Id. at 614. The Eighth Circuit in Barone thus formulated a variant to stream of commerce analysis, concluding that Hosoya was subject to jurisdiction in Nebraska because it had "poured its products into regional distributors throughout the country." Id. at 615. The Eighth Circuit in Barone made clear, however, that a defendant's contact with the forum state still had to be more than "attenuated, random, or fortuitous" for personal jurisdiction to exist. Thus, personal jurisdiction may not have existed in Barone had "someone purchased Hosoya's products from Rich Bros. and taken those fireworks to a state that was outside of Rich Bros. and Hosoya's distribution scheme where the fireworks then caused injury to a third party." Id.

The Eighth Circuit applied the <u>Barone</u> variant in <u>Vandelune</u>. There, the plaintiff sued an English manufacturer of a safety device for use in grain elevators after he was injured in a grain dust explosion in Iowa. 148 F.3d at 945. The manufacturer, who sold its safety device to its independent distributor located in Illinois, successfully moved to dismiss for lack of personal jurisdiction before the district court. <u>Id.</u> In reversing the district court, the Eighth Circuit noted that even though the manufacturer had no office, agent, employee, or property in Iowa, and had not advertised or directly solicited business in Iowa, "the absence of this kind of direct marketing presence does not necessarily mean that [manufacturer] has not purposefully marketed [the safety device] in Iowa." <u>Id.</u> at 948. In determining that the <u>Barone</u> variant applied to the case, the court relied on a number of facts: "(1) the [manufacturer] designed the product at issue for the United States market; (2) the [manufacturer] agreed to distribute its product through affiliates located in the United States; (3) the [manufacturer] put its logo and identifying decals on the product; (4) the [manufacturer] directly shipped some of its products to a distributor in nearby Illinois; (5) the [manufacturer's] employees attended technical support meetings at the distributor's Illinois facilities; and (6) the [manufacturer] sold 619 units to an Illinois distributor, 81 of which were resold in Iowa." <u>Clune</u>, 233 F.3d at 543 (discussing <u>Vandelune</u>, 148 F.3d at 948).

The Eighth Circuit applied the <u>Barone</u> variant again in <u>Clune</u>. There, the decedent died as a result of a fall from a construction hoist manufactured by a Swedish company and sold in Missouri, where the fall occurred, through a distributor. 233 F.3d at 540. The manufacturer succeeded in having the case dismissed for lack of personal jurisdiction by the district court, but once again the Eighth Circuit reversed. <u>Id.</u> Determining that the <u>Barone</u> variant applied, the Eighth Circuit noted several factors: (1) the manufacturer designed its hoists for the United

States markets; (2) the manufacturer had exclusive distribution agreements with United States distributors; (3) the manufacturer's logo was displayed on the products sold in the United States; (4) the manufacturer conducted training seminars for the technician employees of its distributor,[6] who serviced the hoists it sold; (5) 20 to 40 of the 700 hoists sold in the United States had been sold in Missouri; (6) the manufacturer provided sales brochures and instruction manuals to its distributors to promote and service the products; (7) members of the manufacturer's board of directors also served on the board of the subsidiary-distributor. Id. at 543–44. The Eighth Circuit commented that these facts may not be enough to amount to purposeful availment when standing alone, but "when taken together they show that [the manufacturer] engaged in a series of activities that were designed to generate profits to the parent from its subsidiaries' sales across the United States." Id. at 544. The Eighth Circuit concluded that a foreign manufacturer who successfully employs distributors to cover the United States "intends to reap the benefits of sales in every state where the distributors market." Id.

In contrast, the Eighth Circuit refused to apply the Barone variant in Stanton. There, Spire Biomedical (Spire), a Massachusetts corporation, used its ion beam process to apply the patented coating to bulk fabric of its customer, St. Jude Medical, Inc. (St. Jude). 340 F.3d at 693. St. Jude used that fabric to manufacture mechanical mitral heart valves, and the plaintiff's husband had died during an attempted surgical implantation of one such valve in Nebraska. Id. The plaintiff sued in Nebraska federal court arguing that Spire's ion beam process should be treated like the addition of a component part to a product, and that St. Jude acted as a distributor

---

[6] By the time of the litigation, the manufacturer's sole distributor was a wholly owned subsidiary. This subsidiary had been an independent distributor that the manufacturer had originally sold its products through, along with a second distributor. After some years, the manufacturer had terminated its relationship with the second distributor, acquired the original distributor, and sold its products exclusively through that company. Clune, 233 F.3d at 540 n.3.

13

of that product by placing it into the national stream of commerce, rendering Spire subject to jurisdiction in every state. Id. at 694. In rejecting this personal jurisdiction argument, the Eighth Circuit concluded that the plaintiff failed to show that Spire had "availed itself in any way of the benefits of the laws of the forum State." Id. Even if Spire was aware that the product would end up in Nebraska, this did not demonstrate that "Spire 'purposefully avail[ed] itself of the privilege of conducting activities' in Nebraska." Id. (alteration in original) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). "Whatever contacts the fabric processed by Spire may have had with Nebraska were the result of the actions of St. Jude and not of Spire." Id.

The Eighth Circuit has not applied the Barone variant to situations where the defendant did not use distributors to penetrate a market. See Guinness Imp. Co. v. Mark VII Distribs. Inc., 153 F.3d 607, 614–615 (8th Cir. 1998) (finding plaintiff failed to show that a Jamaican beer brewer exercised control over distributors once beer left Jamaica sufficient for personal jurisdiction purposes); Falkirk Mining Co., 906 F.2d at 373–77 (holding there was no personal jurisdiction in North Dakota over a foreign manufacturer of a component part that had been incorporated into a dragline by another manufacturer and sold into North Dakota). For the Barone variant to apply, the key inquiry is whether the manufacturer has utilized a distribution network in order to reach a larger consumer market in which to sell its product. Clune, 233 F.3d at 543 ("In Barone, we endorsed the idea that when a seller heads a distribution network it realizes the much greater economic benefit of multiple sales in distant forums, which in turn may satisfy the purposeful availment test.") (internal quotation marks omitted) (citing Barone, 25 F.3d at 613). Because the manufacturer is, in essence, specifically targeting the consumers in the markets served by its distributors, it "reaps the benefits of a distribution network." 233 F.3d at 543. Such a manufacturer cannot plead ignorance that its products end up in markets it is

specifically targeting, and thus "'it is only reasonable and just that it should...be held accountable in the forum of the plaintiff's choice.'" Id. (quoting Barone, 25 F.3d at 615). In contrast, when a manufacturer supplies a component part to a customer for use in the customer's final product, the manufacturer is not utilizing the customer as a distributor to target a broader market, because the customer is the manufacturer's target, not a wider pool of consumers. See Stanton, 340 F.3d at 694. Even if the manufacturer can predict that its component part will end up in a particular forum as part of the customer's final product, those contacts between the forum and the product are attributable to the customer only, and do not demonstrate that the manufacturer has purposefully availed itself of the privilege of conducting business in the forum State.

This case does not warrant application of the Barone variant. Factually, this case is analogous to Stanton, where the Eighth Circuit declined to apply the Barone variant. TRW supplies component parts (seat belt assemblies) to its customers, primarily vehicle manufacturers, who incorporate those assemblies into the vehicles they manufacture. Doc. 14-1 at ¶ 6. But there is no evidence that TRW is using Ford Motor Company and other vehicle manufacturers to "penetrate a discrete, Multi-State trade area" with the intent "to reap the benefits of sales in every state where the distributors market." Clune, 233 F.3d at 544. TRW is not using Ford to reach a larger pool of consumers for its products; rather, Ford *is* the customer TRW is targeting. "Whatever contacts the [seat belt assemblies] processed by [TRW] may have had with [South Dakota] were the result of the actions of [Ford] and not of [TRW]." Stanton, 340 F.3d at 694. The relevant factors in the cases where the Barone variant has been applied are not present here. TRW has not established a distribution network with the intent of targeting a discrete market as in Barone; it does not supply Ford with materials for promoting the sales of its

products, or training and materials for servicing those products, nor does it exercise any degree of influence or control over Ford, unlike the manufacturers in Vandelune and Clune. In fact, TRW designs and manufactures its product "in accordance with the purchase orders, plans, specifications, and instructions of its *customers*..." Doc. 14-1 at ¶ 6 (emphasis added). Therefore, the Plaintiffs' assertions that TRW knows its parts will end up in South Dakota, that it does not restrict its products from being sold into South Dakota, that it contracts with companies like Ford who it knows will sell its products in South Dakota, even if true, do not constitute purposeful availment by TRW of the "privilege of conducting business" in South Dakota. See Falkirk, 906 F.2d at 375. Thus sufficient minimum contacts between TRW and South Dakota do not exist to justify personal jurisdiction in South Dakota.

Plaintiffs have alleged that TRW is subject to personal jurisdiction in South Dakota because the state is part of the "global market" into which TRW supplies parts and safety systems. Doc. 26 at ¶ 5, Doc. 27 at ¶ 33. Plaintiffs assert that TRW manufactures its seat belts in accordance with Federal Motor Vehicle Safety Standards and works with the National Highway Traffic Safety Administration on safety issues regarding products in vehicles used by South Dakota residents. Doc. 26 at ¶¶ 13–14, Doc. 27 at ¶ 33. The implication of these allegations is that TRW has targeted every jurisdiction within this global market and presumably is subject to personal jurisdiction in each of them. This Court is not persuaded.

As to the notion that TRW has availed itself of a global market, Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc., 950 F.2d 526 (8th Cir. 1991), is instructive. In Soo Line, the defendant, Hawker Siddeley, was a Canadian corporation that manufactured railroad cars. Id. at 527. Hawker Siddeley sold a railroad car to North American Car Corporation (North American), which in turn entered into a management and service agreement with General Electric Railcar

Services Corporation (GERASCO), a Canadian corporation, to allow GERASCO to lease the car on North American's behalf. Id. at 528. GERASCO leased the car to Potash Company of America (PCA), a Canadian corporation, and while Soo Line was transporting the railcar on its tracks for PCA, the train derailed near Winona, Minnesota. Id. Soo Line sued Hawker Siddeley in Minnesota federal court arguing that Hawker Siddeley had availed itself of a discrete market, which included Minnesota, through a number of contacts.[7] The plaintiffs relied heavily on the fact that Hawker Siddeley's cars and wheels were manufactured in accordance with the standards established by the Association of American Railroads (AAR), which was a requirement for all cars that operated within the interchange service market. Id. The interchange service market covered by AAR encompassed most railroads in Mexico, Canada, and the forty-eight contiguous United States. Id. Hawker Siddeley also conceded that it was quite likely that many of its railcars had traveled on tracks in Minnesota. Id. at 527–528.

In rejecting Soo Line's arguments for personal jurisdiction in Minnesota, the Eighth Circuit reasoned that Soo Line's argument "would subject Hawker Siddeley to suit anywhere its customers use its railcars" and that this was the very approach the Supreme Court rejected in World-Wide Volkswagen. Soo Line, 950 F.2d at 529 ("In so doing, the Court reaffirmed that the mere unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." (internal quotation marks omitted)). The Eighth Circuit also noted that Soo Line wrongly equated purposeful availment of the opportunity to enter a market with purposeful availment of a forum state's benefits and protections. Id. (" Neither the fact that the interchange service market is a readily identifiable

---

[7] Soo Line explicitly stated that it was not asserting personal jurisdiction existed over Hawker Siddeley merely because it had introduced the railcar into the stream of commerce. Soo Line, 950 F.2d at 529 n.3.

17

market nor the fact that it has formally established standards for goods and services means that every participant in the market is subject to suit everywhere its products are used within that market."). The Eighth Circuit concluded that "minimum contact analysis does not permit contact with a market to substitute for contact with a forum." Id.

Soo Line undermines the Plaintiffs' assertion for personal jurisdiction over TRW in South Dakota. The fact that TRW serves a global market that includes all fifty states and manufactures a product in accordance with FMVSS and NHTSA standards is evidence that TRW is purposefully availing itself of a market for its product in the vehicle industry, but not necessarily of the forum state of South Dakota. See 950 F.2d at 529. The fact that such a market naturally includes South Dakota does not render TRW subject to jurisdiction in South Dakota. Moreover, just as the traveling of "many [of its] railcars" through Minnesota did not render Hawker Siddeley subject to personal jurisdiction in that forum, nor would the presence of TRW component parts in many vehicles in South Dakota give rise to personal jurisdiction in this case. Because the Plaintiffs have not made a prima facie case that personal jurisdiction exists here, TRW's motion to dismiss for lack of personal jurisdiction is granted.

**B. Jurisdictional Discovery**

The Plaintiffs have requested discovery relating to jurisdictional issues in order to "prevent unfair prejudice." Doc. 27 at ¶ 36. A district court's denial of a request for jurisdictional discovery will be upheld so long as that denial is not an abuse of discretion. Lakin v. Prudential Secs., Inc., 348 F.3d 704, 713 (8th Cir. 2003). "When a plaintiff offers only speculation or conclusory assertions about contacts with a forum state, a court is within its discretion in denying jurisdictional discovery." Dever v. Hentzen Coatings, Inc., 380 F.3d 1070, 1074 n.1 (8th Cir. 2004) (quoting Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc., 334

F.3d 390, 402 (4th Cir. 2003)). Jurisdictional discovery is not warranted here because it is not the case that "certain facts necessary to resolving the jurisdictional inquiry are either unknown or disputed." Viasystems, Inc., v. ebm-papst St. Georgen GmbH & Co. KG, No. 4:09CV02076 ERW, 2010 WL 2402834, at *9 (E.D. Mo., June 11, 2010). As stated above, Ford is not TRW's distributor in the way that would allow the application of the Barone variant, thus there is no personal jurisdiction under a stream of commerce analysis here. Additionally, TRW has presented evidence that it has no direct contacts with South Dakota. Doc. 14-1 at ¶¶ 12a–i. Thus jurisdiction cannot arise under a straightforward application of the Eighth Circuit's five-factor test either.

Nor will the Plaintiffs be unfairly prejudiced by denial of jurisdictional discovery. The Plaintiffs are residents of Texas, with little interest in litigating this case in South Dakota.[8] TRW is subject to general personal jurisdiction in Delaware, where it is incorporated, and Michigan, where it has its principal place of business. Doc. 14-1 at ¶ 5. TRW also may be subject to personal jurisdiction involving its seat belt assemblies in the courts of Kentucky, where the subject seat belt assembly was sold to Johnson Controls, Inc., and possibly in states other than South Dakota. Because the Plaintiffs have not explained what evidence they could potentially discover that would allow this Court to exercise personal jurisdiction over TRW in a way that comports with the Due Process Clause, and because there are alternative forums for the Plaintiffs to bring this action, the request for jurisdictional discovery is denied.

---

[8] In their Second Amended Complaint, the Plaintiffs make a number of allegations regarding TRW's restraint system and its generally defective and unsafe condition. Doc. 26 at 10–13. The Plaintiffs note that "[d]efendant is currently in exclusive possession and control of all the technical materials and other documents regarding the design, manufacture, and testing of the restraint system in question." Doc. 26 at ¶ 65. Therefore, the evidence that the Plaintiffs believe will prove their case is not located in South Dakota, but with TRW. While the accident which resulted in Hector Ruiz's tragic death occurred in this state, there is no practical reason for the plaintiffs to litigate in this forum.

## III. Conclusion

For the reasons explained above, it is hereby

ORDERED that Defendant's motion to dismiss for lack of personal jurisdiction in this Court, Doc. 13, will be granted. It is further

ORDERED that Plaintiffs' request for jurisdictional discovery is denied. It is finally

ORDERED that this Court will delay entry of judgment of dismissal for fourteen days to allow Plaintiffs, if they wish, to file a motion for transfer of this case to a district court with jurisdiction in lieu of dismissal.

DATED this 22nd day of September, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE